[Cite as *Individual Business Servs. v. Carmack*, 2011-Ohio-1824.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| INDIVIDUAL BUSINESS SERVICES, et al. | : | |
| | : | Appellate Case No.   24085 |
| | : | |
| Plaintiffs-Appellees | : | Trial Court Case No.   04-CV-8159 |
| | : | |
| v. | : | |
| | : | (Civil Appeal from |
| DANIES CARMACK, et al. | : | Common Pleas Court) |
| | : | |
| Defendants-Appellants | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 15ᵗʰ day of April, 2011.

. . . . . . . . . . .

DAVID C. GREER, Atty. Reg. #0009090, 6 North Main Street, Suite 400, Dayton, Ohio 45402-1908
    Attorney for Plaintiffs-Appellees

RICHARD B. REILING, Atty. Reg. #0066118, 5045 North Main Street, Suite 320-D, Dayton, Ohio 45415
    Attorney for Defendants-Appellants

. . . . . . . . . . . .

FAIN, J.

{¶ 1} Defendants-appellants Danies Carmack, the Estate of Robert Carmack, and

Sunset Cottages, LLC, appeal from a summary judgment rendered in favor of International

Business Systems, Inc., and Citizens Motorcar Company d/b/a America's Packard Museum. The trial court concluded that transfers of property by the defendants in 2003 and 2004, were fraudulent, and awarded judgment against defendants in the amount of $192,055.61, plus interest from July 31, 2003. Defendants contend that the trial court erred in rendering summary judgment, because they presented evidence that the conveyances were made in the ordinary course of business and for estate planning purposes. Defendants also contend that the trial court erred in refusing to reconsider its summary judgment decision when presented with evidence: (1) that alleged loan payments to Danies Carmack were dividends, rather than loans; (2) that certain property was exempted from fraudulent alienation under Florida state law; and (3) that Danies Carmack did not own certain property at the time of the alleged fraudulent transfers.

{¶ 2} We conclude that genuine issues of material fact exist with regard to the issue of whether the property was fraudulently transferred. Accordingly, the judgment of the trial court is Reversed on the issue of the fraudulent transfers only, and this cause is Remanded to the trial court for further proceedings.

I

{¶ 3} The case before us has a tortured history, spanning nearly ten years. In the year 2000, Danies Carmack owned and operated International Business Systems, Inc. (IBS). Danies had owned IBS for about fifteen years, and had worked there for twelve years before becoming the sole shareholder, owner, and director of the company. IBS was a profitable business that was involved in printing, copying, secretarial, and telephone answering services.

IBS had numerous clients, including Miami Valley Schools and the University of Dayton, which was its largest client.

{¶ 4} Danies decided to retire in 2000, and retire to Key West, Florida, with her husband, Robert. The couple discussed donating IBS either to the University or to Miami Valley schools, but ultimately decided to donate it to Citizens Motorcar Company d/b/a America's Packard Museum (CMC), at the suggestion of Robert Signom, an attorney who had done legal work for IBS.

{¶ 5} Danies donated IBS to CMC in December 2000. At the time, IBS's books reflected loans amounting to $192,055.61 that had been made to Danies. Danies denied any intention to donate the loans as well as the business. However, the Carmacks took a charitable deduction of about $356,000 for the donation, which included the value of the loans.

{¶ 6} After the stock was transferred to CMC, Danies continued to be involved with IBS for three or four months, but concluded her involvement in April 2001. When Danies left, the business was financially sound. CMC operated the business for a short time, but in June 2002, First National Bank of Southwestern Ohio (First National) sued IBS, CMC, and Danies for breach of a commercial lease, alleging that the lease had not been paid in the months of February through June, 2002. See *First National Bank of Southwestern Ohio v Individual Business Services, Inc.,* Montgomery County Common Pleas Case No. 02CV3956.

{¶ 7} Due to the alleged breach, First National elected to declare the entire amount of the lease due, which was $47,900.27. Danies was included in the suit, because she had allegedly signed the lease as an unconditional guarantor.

{¶ 8} In August 2002, IBS and CMC filed a cross-claim against Danies. They also filed a third-party complaint against Robert. IBS and CMC alleged that Danies had removed approximately $12,500 from IBS between January and March, 2001, without the permission or knowledge of IBS or CMC. IBS and CMC further alleged that Danies had withdrawn about $196,000 from IBS prior to December 2000, and had designated the amounts as loans to shareholders, rather than as income. Another claim for relief involved alleged misrepresentations by Danies and Robert Carmack regarding the loans and financial condition of IBS.

{¶ 9} According to Danies, she and Robert originally consulted attorney Roger Makely about the lawsuit, who told them it was "laughable," and had no substance. Makely referred them to attorney Richard Boucher, who appeared on their behalf. Danies also stated that Makely told Robert to continue doing business as he had always done. Robert was involved in doing development work for nonprofit corporations, through a business he owned called Charitable Resources Management (CRM). Robert also bought and sold properties, often borrowing money from one property to buy another. Robert was licensed in real estate, and had been buying and selling properties from the time that he and Danies were married in 1967.

{¶ 10} In January 2003, First National filed a motion for summary judgment against IBS and Danies. In April 2003, the trial court rendered summary judgment against IBS, concluding that IBS was in default of the lease agreement. The trial court concluded, however, that genuine issues of material fact existed concerning whether Danies had signed the lease as a personal guarantor. The trial court also filed a pre-trial order in April 2003, setting the trial date for July 28, 2003.

{¶ 11} In late June 2003, IBS and CMC filed a motion for summary judgment against Danies and Robert. On July 8, 2003, a stipulation was filed, dismissing the misrepresentation claims (fourth claim for relief) against Danies and Robert, without prejudice. On the same date, First National also dismissed its claims against Danies, with prejudice.

{¶ 12} Subsequently, on July 31, 2003, the trial court rendered summary judgment against Danies on IBS's and CMC's third claim for relief, which sought judgment based on the loan/account receivable on the IBS books for $192,055.61. The court overruled the motion for summary judgment on the first two claims for relief (conversion and breach of fiduciary duty), because IBS and CMC had failed to present any evidence regarding those claims. On August 13, 2003, Danies filed a motion for reconsideration, contending that genuine issues of material fact existed regarding the issue of whether a mutual mistake of fact had been made when IBS was donated to CMC. The court denied the motion for reconsideration on September 18, 2003, and expressly stated that its decision was a final appealable order.

{¶ 13} Danies appealed from the trial court's decision on October 17, 2003. Shortly thereafter, IBS and CMC dismissed their remaining claims against Danies and their third-party complaint against Robert. In March 2004, the Second District Court of Appeals dismissed the appeal for lack of prosecution. See *First National Bank of Southwestern Ohio v. Individual Business Services, Inc.* (March 8, 2004), Montgomery App. No. 20177. IBS and CMC then filed a praecipe in April 2004, asking for issuance of a certificate of judgment against Danies in the amount of $192,055.61, plus 10% interest from July 31, 2003.

{¶ 14} Subsequently, in late November 2004, IBS and CMC filed the current action

against Danies, Robert, and an entity called Sunset Cottages, LLC (Sunset). The complaint contained five counts. The first two counts alleged that Danies, as trustee of a revocable trust, had fraudulently transferred her interest in 5188 Mad River Road (Mad River Property) to Robert on March 2, 2004, in violation of R.C. 1336.04 and R.C. 1336.05. The third and fourth counts alleged that Danies had fraudulently transferred her interest in a Key West condominium (Key West Property) to Sunset in January 2003, in violation of R.C. 1336.04 and R.C. 1336.05. Finally, the fifth count alleged that Robert and Sunset had been unjustly enriched by the transfers, and should be held to be constructive trustees of all money or property received from Danies. IBS and CMC requested $192,055.61, plus interest from July 31, 2003, punitive damages, attorney fees, the imposition of a constructive trust, attachment of the certificate of judgment to various properties, and a declaration that IBS and CMC could levy execution of judgment against the Mad River Property and against a property at 4404 Toulouse Court in Dayton, Ohio, that Robert and Sunset had purchased in September 2004 (Toulouse Property).

{¶ 15} In January 2005, the Carmacks and Sunset filed an answer raising defenses like unclean hands. They also filed a counterclaim against CMC pertaining to a truck Robert had donated to CMC. Discovery then proceeded.

{¶ 16} Subsequently, in October 2006, Danies filed a motion under Civ. R. 60(B)(5), asking the court in the original action to set aside the July 31, 2003 judgment. In the motion, Danies alleged that recent depositions taken in the fraudulent conveyance case had uncovered evidence of fraud on the part of Signom in pursing the original claim against Danies. In particular, Danies alleged that Signom had perpetrated a fraud upon the court by pursing

claims without the approval or authority of the board of CMC. Based on the existence of this motion, the trial court in the fraudulent conveyance case stayed the action pending resolution of the motion for relief from judgment.

{¶ 17} The matter was referred to a magistrate, who heard evidence and issued a decision in February 2007, granting the motion to set aside the judgment. The magistrate was highly critical of Signom's conduct, and described his testimony at the hearing as "contradictory, self-serving, incredible, disrespectful, illogical, and perhaps even unethical." February 2, 2007 Magistrate's Decision Granting Carmack's Motion to Set Aside Judgment, p. 4. The magistrate concluded that Danies had consistently taken the position that the loan was never intended to be paid to CMC when she donated the assets of her company to CMC. Id. at 2. The magistrate further concluded that Signom had perpetrated a fraud upon the court by filing a purely voluntary and unnecessary counterclaim against Danies when he knew that he lacked authority to do so, but represented to the court that he did, in fact, have authority. Id. at 12. In this regard, the magistrate noted that:

{¶ 18} "When faced with two collection actions, one seeking foreclosure, unpaid property tax, unpaid employees, and a new business to run, IBS, that was not proving profitable, Signom was forced to take whatever action he could to seek additional funding. He obviously made a unilateral, discretionary decision to file a lawsuit against a prior contributor, even though the chances of recovery were questionable, to give an appearance to other creditors that he was aggressively pursuing all accounts receivable. When the ethics of his conduct were raised as a defense to the action, he again made a unilateral, discretionary decision to hire outside counsel to become even more aggressive in his collection efforts in an

attempt to recover something to make up for his misconduct. In a continuation of his pattern of questionable conduct, in the end he had to again rely on half-truths and blind loyalty to demand that the current board vote to ratify his actions, even though he concealed material facts." Id. at 12-13.

{¶ 19} After IBS and CMC filed objections to the magistrate's decision, the trial court sustained the objections in September 2007. The trial court held that Signom, as president of CMC, had apparent or actual authority to file claims on its behalf, and had implied authority to act on behalf of IBS. See September 11, 2007 Decision, Order and Entry Granting Individual Business Services Inc. and Citizens Motorcar Company's Objections to Magistrate's Decision, Overruling Magistrate's Decision and Denying Danies Carmack's Motion to Set Aside the Judgment, pp. 13-14.

{¶ 20} Following the ruling on the Civ. R. 60(B) motion, the fraudulent conveyance action was reactivated. Before the stay was issued, IBS and CMC had filed a motion for summary judgment, relying on depositions taken of Robert in November 2005 and June 2006, and of Danies in June 2006.[1] The Carmacks and Sunset replied to the motion in November 2007. IBS and CMC then filed a reply and motion to strike the affidavits of Danies and Robert, which were attached to the memorandum opposing summary judgment.

{¶ 21} In February 2008, the trial court sustained the motion to strike the affidavits and rendered summary judgment in favor of IBS and CMC. The court held that the affidavits were conclusory and did not comply with Civ. R. 56. The court also struck a letter from prior

---

[1] These depositions were filed with the trial court, but were inadvertently destroyed by the clerk. IBS and CMC have attached copies of the depositions to their brief.

counsel for IBS and CMC as inadmissible. Finally, the court held the following transfers were fraudulent: (1) The transfer of $115,000 in loan proceeds to Robert on July 30, 2003; (2) the transfer of the Mad River Property from the trust to Robert in March 2004; (3) a transfer of the Key West Property to Sunset in January 2003; and (4) the transfer of the proceeds from a sale of the Key West Property in repayment of a loan taken out in October 2003. The trial court also rejected Robert's counterclaim regarding the truck that had allegedly been donated. The court ordered judgment against Robert Carmack and Sunset in an amount to be determined.

{¶ 22} After the trial court issued its decision on summary judgment, Danies, Robert, and Sunset filed another motion for stay, requesting that the matter be stayed until a decision was rendered on their appeal from the decision denying the Civ. R. 60(B) motion for relief. The trial court again granted a stay. Subsequently, in August 2008, we affirmed the decision denying the motion for relief from judgment. See *First National Bank of Southwestern Ohio v. Individual Business Services, Inc.*, Montgomery App. No. 22435, 2008-Ohio-3587. We agreed with the trial court that Signom had authority to file the cross-claim against Danies, and that his actions, therefore, could not have constituted fraud on the court. Id. at ¶ 13. We also held that the motion was untimely, because the witnesses Danies relied on were known to her long before she filed her motion. Id. at ¶ 19. No further appeal was taken from our judgment.

{¶ 23} Subsequently, in January 2009, the Montgomery County Common Pleas Court dismissed the fraudulent conveyance action without prejudice, due to a federal bankruptcy filing. In July 2009, a suggestion of death was filed, indicating that Robert Carmack had died

in June 2009. The case was then reactivated in August 2009, and Robert's estate was substituted as a defendant.

{¶ 24} After the reactivation, Sunset filed a motion for reconsideration in February 2010. At that time, Sunset asked the trial court to reconsider the summary judgment decision, based on the Florida homestead exemption. The trial court rejected the motion in April 2010, concluding that it was untimely, having been filed almost a year after the original summary judgment decision.[2] The court also rejected the motion on its merits, finding that all indicia, other than Danies' driver's license, indicated that Danies and Robert were Ohio residents. Finally, the court rejected an oral motion that had been made regarding the failure of IBS and CMC to name the trust or trustee as a party. The court concluded that the settler of a revocable trust may be named as the principal party in interest and the plaintiff need not name the trust.

{¶ 25} Previously, in February 2010, the trial court held a bench trial to determine whether punitive damages should be awarded, and if so, in what amount. After hearing evidence from Signom, Danies, and the two daughters of Robert and Danies, the court issued a decision in April 2010, on the same day that it issued the decision denying reconsideration of the prior summary judgment decision. The court rejected punitive damages, concluding that a finding of fraudulent conveyance is not sufficient to award punitive damages. The court observed that the while evidence at the hearing suggested that Danies and Robert were angry at what they considered a betrayal of trust by a friend which resulted in a significant judgment,

---

[2] The trial court was actually incorrect, as the summary judgment decision was filed nearly two years earlier, not one year. While this does not aid the Carmacks, it is true that the fraudulent conveyance action was also stayed for a significant period of time after the initial decision on summary judgment, due to Danies' appeal of the Civ. R. 60(B) decision and the bankruptcy stay.

Danies contended that the transfers were in the ordinary course of business and for estate planning. In this regard, the court noted that there was evidence before it of the fact that the conveyances were in the normal course of business and for estate planning purposes. The court, therefore, concluded that IBS and CMC had failed to establish by clear and convincing evidence that Robert's and Danies' conduct was with malice sufficient to award punitive damages. The court then filed a judgment entry in May 2010, ordering judgment against Danies, the Estate of Robert Carmack, and Sunset, in the amount of $192,055.61, plus interest from July 31, 2003. In addition, the court ordered that the judgment would constitute a lien as of November 24, 2004, against the Mad River and Toulouse properties.

{¶ 26} Danies, the Estate of Robert Carmack, and Sunset filed an appeal from the judgment. IBS and CMC did not cross-appeal from the decision rejecting punitive damages.

II

{¶ 27} The first assignment of error raised by Danies, the Estate of Robert Carmack, and Sunset (or defendants, collectively), is as follows:

{¶ 28} "THE TRIAL COURT ERRED BY GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT."

{¶ 29} Under this assignment of error, defendants contend that genuine issues of material fact exist because there is evidence that the conveyances were made in the ordinary course of their business and for estate planning purposes. Defendants contend that a trier of fact could reasonably conclude that fair consideration was given for each transfer. Defendants also maintain that the trial court erred in rejecting their affidavits.

{¶ 30} "A trial court may grant a moving party summary judgment pursuant to Civ. R. 56 if there are no genuine issues of material fact remaining to be litigated, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his favor." *Smith v. Five Rivers MetroParks* (1999), 134 Ohio App.3d 754, 760. "We review summary judgment decisions de novo, which means that we apply the same standards as the trial court." *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127, 2007-Ohio-2722, ¶ 16.

{¶ 31} IBS and CMC argued in the trial court that the property transfers are fraudulent conveyances under R.C. 1336.04 and R.C. 1336.05. R.C. 1336.04 provides that:

{¶ 32} "(A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:

{¶ 33} "(1) With actual intent to hinder, delay, or defraud any creditor of the debtor;

{¶ 34} "(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:

{¶ 35} "(a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;

{¶ 36} "(b) The debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due."

{¶ **37**} R.C. 1336.04(B) further provides that:

{¶ **38**} "In determining actual intent under division (A)(1) of this section, consideration may be given to all relevant factors, including, but not limited to, the following:

{¶ **39**} "(1) Whether the transfer or obligation was to an insider;

{¶ **40**} "(2) Whether the debtor retained possession or control of the property transferred after the transfer;

{¶ **41**} "(3) Whether the transfer or obligation was disclosed or concealed;

{¶ **42**} "(4) Whether before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;

{¶ **43**} "(5) Whether the transfer was of substantially all of the assets of the debtor;

{¶ **44**} "(6) Whether the debtor absconded;

{¶ **45**} "(7) Whether the debtor removed or concealed assets;

{¶ **46**} "(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

{¶ **47**} "(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

{¶ **48**} "(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred;

{¶ **49**} "(11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor."

{¶ **50**} These eleven factors are referred to as "badges of fraud."   We have noted that a

plaintiff does not have to show evidence of all the badges of fraud. *Gevedon v. Ivey* , 172 Ohio App.3d 567, 2007-Ohio-2970, ¶ 76. " ' "Badges of fraud" are circumstances so frequently attending fraudulent transfers that the inference of fraud arises from them.' " Id.

{¶ 51} The burden of proof in actions to set aside a fraudulent conveyance, "must be affirmatively satisfied by the complainant." *Stein v. Brown* (1985), 18 Ohio St.3d 305, 308. However, if the party alleging fraud demonstrates "a sufficient number of badges, the burden of proof then shifts to defendant to prove that the transfer was not fraudulent." *Baker & Sons Equip. Co. v. GSO Equip. Leasing, Inc*. (1993), 87 Ohio App.3d 644, 650, citing *Cardiovascular & Thoracic Surgery of Canton, Inc. v. DiMazzio* (1987), 37 Ohio App.3d 162, 166. Notably, however, even if the evidence establishes evidence of a sufficient number of badges, summary judgment is not proper if a genuine dispute exists about whether a transfer was supported by a reasonably equivalent value. See, e.g., *Barton v. Triplett*, Franklin App. No. 01AP-357, 2002-Ohio-580, and *Dolce v. Lawrence* (Sept. 30, 1999), Lake App. No. 98-L-080. See also, *UAP-Columbus JV326132 v. Young*, Franklin App. No. 09AP-646, 2010-Ohio-485 (reversing summary judgment for creditor. The Tenth District Court of Appeals also concluded in *Young* that the trial court did not err in denying a property transferee's summary judgment motion. Three badges of fraud were shown, and there were factual issues concerning whether the judgment debtor's transfer of property to a trust was a fraudulent transfer, precluding summary judgment).

{¶ 52} With these standards in mind, we will consider the four transfers discussed by the trial court.

### A.   The $115,000 Loan Proceeds Transferred to Robert

{¶ 53} In the case before us, the trial court found four badges of fraud regarding the transfer of $115,000 in proceeds from a loan taken out on the Mad River Property on July 30, 2003.   Danies and Robert obtained title to this property in 1985.   In 1999 or 2000, the Mad River property was transferred into the Danies Carmack Revocable Trust, which had previously been established in 1998.   Danies was the sole grantor and sole trustee for the trust.   When the $115,000 loan was taken out on the property in July 2003, the money was given to Robert for use in his business.

{¶ 54} According to Robert, the intended course of events was that Robert would loan the money to his companies, which would pay him back.   Robert would use the money to pay off the loan.   However, there was no written agreement to do so, and as of the time of his deposition in November 2005, Robert had not been paid by his companies, and he had not yet paid back the $115,000.   November 28, 2005 Deposition of Robert Carmack, pp. 38-40.

{¶ 55} The loan was taken out by Danies, as trustee, on behalf of the trust.   Id. at 35-36.   The terms of the trust permitted Danies to revoke the trust in its entirety or to withdraw the assets at any time during her lifetime.   It also allowed her to use all or any part of the income or principal of the trust for her own benefit, or to benefit Robert and their children.

{¶ 56} Danies argues that the Mad River Property was transferred to the trust in 1999, prior to the donation of her business, and prior to the 2002 lawsuit.   Danies also notes the lack of evidence that she was insolvent when the Mad River Property was transferred to the trust.   And finally, Danies argues that the trust was not made a party to the suit, and that the trial

court failed to consider the terms of the trust.

{¶ 57} Technically, the property in the trust did not legally belong to Danies when the $115,000 loan was obtained. However, R.C. 5805.06, which was enacted in 2006, provides that:

{¶ 58} "(A) Whether or not the terms of a trust contain a spendthrift provision, all of the following apply:

{¶ 59} "(1) During the lifetime of the settlor, the property of a revocable trust is subject to claims of the settlor's creditors."

{¶ 60} Although R.C. 5805.06 was not in effect at the time of the $115,000 loan, a predecessor statute, R.C. 1335.01(A), similarly provided that:

{¶ 61} "A trust with a reserved use of power is valid as to all persons, except that any beneficial interest reserved to the creator may be reached by his creditors and except that, if the creator reserves to himself for his own benefit a power of revocation, a court, at the suit of any creditor of the creator, may compel the exercise of the power to the same extent and under the same conditions that the creator could have exercised the power."

{¶ 62} Under the trust terms, Danies retained the power to revoke the trust, and R.C. 1335.01(A) would have allowed IBS and CMC to compel her to revoke the trust and subject the property in the trust to creditors' claims. Accordingly, even if Danies did not have existing creditors when the trust was created in 1998, or when the Mad River Property was placed in the trust, future creditors could compel Danies to revoke the trust and allow assets to be used to pay the creditors' claims. The focus, therefore, should be on the state of affairs that existed in July 2003, and whether genuine issues of material fact exist regarding the

alleged fraudulent nature of giving Robert the $115,000 loan proceeds

{¶ 63} After considering the evidence, we conclude that there are genuine issues of material fact regrading the transfer of the loan funds. The trial court found four badges of fraud, and we agree that at least four badges exist. First, the money obtained from the loan was transferred to Robert, who was an "insider" under R.C. 1336.01(G)(1)(a), which includes relatives of the debtor, if the debtor is an individual. Second, there is no evidence that the transfer was disclosed, as the mortgage was not recorded.[3]

{¶ 64} Third, Danies had been sued before the loan funds were transferred to Robert. Fourth, when the loan proceeds were given to Robert, Danies was unemployed and her assets consisted only of her personal belongings and furniture, which were not worth more than $50,000.[4] Danies was therefore insolvent, or became insolvent shortly after the loan was taken out, as a result of the $192,055.61 judgment rendered against her on July 31, 2003. Fifth, the transfer was of most of Danies' assets at the time. Even though the Mad River property was in trust, Danies could have revoked the trust at any time, and the trust assets were subject to attachment by creditors. Finally, the transfer occurred shortly before Danies, the debtor, incurred a substantial debt. R.C. 1336.01(E) defines a debt as liability on a claim. In turn, a claim is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed,

---

[3] This particular badge is somewhat questionable, as there is no evidence of concealment; it appears that Fifth Third Bank simply neglected to record the mortgage.

[4] According to the testimony, the Mad River property was encumbered by a first mortgage in the amount of about $50,000 when the $115,000 July 2003 mortgage loan was obtained from Fifth Third Bank. These loans equaled the value of the property at the time of the July 2003 loan, so Danies would have had no assets or potential assets, other than her personal belongings.

undisputed, legal, equitable, secured, or unsecured." R.C. 1336.01(C). These six "badges of fraud" correspond to R.C. 1336.04(B)(1), (3), (4), (5), (9), and (10).

{¶ 65} However, there is a factual issue regarding whether the value of the consideration given was reasonably equivalent to the obligation incurred. R.C. 1336.04(B)(8). Although there was no written agreement obligating Robert to pay the trust back for the loan, Robert did sign the mortgage agreement with Fifth Third Bank, which would have legally obligated him to pay back the loan to the bank. During his deposition, Robert identified an unsigned mortgage loan agreement that lists him as a borrower on the loan, and indicated that he likely had a signed copy at home, because the bank "wouldn't have made the loan if we hadn't signed." November 23, 2005 deposition of Robert Carmack, p. 33; June 29, 2006 Deposition of Danies Carmack, pp. 24-25; and Plaintiff's Exhibit 2, attached as Exhibit 3 to the motion for summary judgment filed by IBS and CMC. Robert also testified that the money was given to him for use in his businesses, that he considered it "his" money, and that he intended to pay the trust back.

{¶ 66} The trial court did not consider Robert's obligation on the mortgage, and this matter raises a factual issue about whether the transfer was fraudulent, despite the evidence of other badges of fraud. If Robert did repay the loan to Fifth Third Bank, which he was legally obligated to do, the trust would have retained the value of the asset, at least at that particular time. The existence of reasonably equivalent consideration for the transfer is a critical point, because "A transfer or an obligation is not fraudulent under division (A)(1) of section 1336.04 of the Revised Code against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee." R.C. 1336.08(A). See, also, *In re*

*Hanson* (N.D. Ohio 2007), 373 B.R. 522 (noting that value is given for a transfer if property is transferred or antecedent debt is secured or satisfied). Robert also stated that he intended to pay back the trust, and there is no evidence controverting that.

{¶ 67} In addition to alleging a fraudulent conveyance under R.C. 1336.04, IBS and CMC contended in the trial court that the $115,000 transfer was fraudulent under R.C. 1336.05(A). This statute provides that:

{¶ 68} "A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."

{¶ 69} Establishing this claim requires both prongs: lack of reasonably equivalent value and insolvency. Again, Robert's legal obligation to pay the loan back to Fifth Third Bank is evidence that Danies, as trustee, received a reasonably equivalent value in exchange for the transfer of the loan proceeds. Accordingly, there are genuine issues of material fact in connection with the transfer of the $115,000 loan proceeds, and the trial court erred in rendering summary judgment regarding the transfer of this item of property. We should stress that this finding does not mean the validity of the judgment against Danies may be relitigated. That judgment is final and can no longer be challenged. Some evidence about the factual background may be relevant, however, to the issues of whether Robert took the property in good faith for a reasonably equivalent value.

B.   March 2004 Transfer of the Mad River Property

{¶ 70} The second item of alleged fraudulent conveyance is the March 2, 2004 transfer of the Mad River Property to Robert.   The trial court concluded that six badges of fraud exist regarding this transfer.

{¶ 71} As was noted, the $192,055.61 judgment was rendered against Danies in July 2003.   In October 2003, the trial court issued a judgment entry denying a motion for reconsideration that Danies had filed.   The trial court also issued a Civ. R. 54(B) certification at that time.   Danies then filed a notice of appeal from this judgment in November 2003. Danies received extensions of time to file a brief in the appeal, but failed to file a brief.   She also failed to respond to a motion to dismiss the appeal that was filed by IBS and CMC in January 2004.   Accordingly, on March 8, 2004, the appeal was dismissed, based on Danies' failure to file a brief, and failure to respond to the motion to dismiss.   See *First National Bank of Southwestern Ohio v. Individual Business Services, Inc*. (March 8, 2004), Montgomery App. No. 20177.

{¶ 72} Shortly before the appeal was dismissed, Danies signed a quit-claim deed, as trustee, conveying the Mad River property to Robert.   At the time, the house and a life insurance policy were the only assets in the trust, and the house was encumbered by the prior loans.   Again, the assets in the trust would have been subject to attachment by creditors, and Danies could have been required to revoke the trust based on a suit by a creditor.

{¶ 73} After the quit-claim deed was signed, another loan was taken out on the Mad River Property in May 2004.   June 29, 2006 Deposition of Danies Carmack, p. 40.   This was a $165,000 loan that was taken out to consolidate two existing loans on the property: a

$50,000 loan to U.S. Bank, and the $115,000 loan to Fifth Third Bank. The purpose of the consolidation was to make the payments cheaper. November 28, 2005 Deposition of Robert Carmack, pp. 46-47. No money was exchanged as a result of the loan.

{¶ 74} Robert testified that Danies, as trustee, signed the quit-claim deed, because Robert was the person responsible for making the payments. The property, therefore, was placed in his name. Id. at p. 57. Robert again indicated that he was going to hold the trust harmless on the loan. Id. at 76.

{¶ 75} As with the $115,000 payment of the loan proceeds, the evidence contains various badges of fraud. In contrast to the $115,000 loan proceeds, however, the property itself was transferred, and virtually nothing other than the life insurance policy remained in the trust. Thus, even if Robert repaid the loan, the trust would not have received equivalent value.

{¶ 76} Nonetheless, we conclude that factual issues preclude summary judgment on this point. According to the testimony, Robert was the wage-earner in the family, and his business income is what supported the family. Robert was also the source of income that fueled the trust. He had always made the payments on the loans, and his income generated all the payments for everything. November 28, 2005 Deposition of Robert Carmack, pp. 43 and 88. Well before the 2002 lawsuit, the titled ownership of the Mad River property had changed title between Danies and Robert a number of times, depending on business needs. Id. at 31-32. The testimony also indicated that Robert's business method was to mortgage properties in order to obtain money to purchase other properties and for operating money to keep his businesses going forward. Id. at 34 and 89. For example, Robert used funds from

the loans to purchase and renovate the Skyline Shopping Center through a limited liability company, and to operate CRM, which was his consulting business. Id. at 19-20, 23, and 34-35.

{¶ 77} Regarding the transfer of the deed, Robert testified as follows:

{¶ 78} "Q. Did you execute that deed for any other reason other than consolidating your loans and making your payments lower?

{¶ 79} " * * *

{¶ 80} "THE WITNESS: The quit-claim deed?

{¶ 81} "Q. Yes.

{¶ 82} " * * *

{¶ 83} "THE WITNESS: This gets so bizarre. I mean, the intent of all of this was to combine these loans, make the payments cheaper, and the property was – would be in my name because I would be the person responsible to make all the payments anyway." Id. at 57.

{¶ 84} Robert testified that the fair market value of the property in March 2004 was approximately the same as the value of the loans against the property – $165,000 to $169,000. November 28, 2005 Deposition of Robert Carmack, p. 82. In contrast, the expert retained by IBS and CMC estimated the fair market value of the property to be $200,000. The trial court credited the affidavit of the appraiser, and concluded that the value of the property fraudulently transferred was $150,000, because there was an existing valid lien of $50,000 on the property.

{¶ 85} "Under the owner-opinion rule, an owner of real property, by virtue of his ownership and without qualification as an expert, is competent to testify to his property's fair

market value." *Cincinnati v. Banks* (2001)*,* 143 Ohio App.3d 272, 291, citing *Tokles & Son, Inc. v. Midwestern Indemn. Co.* (1992), 65 Ohio St.3d 621, paragraph two of the syllabus.   In addition to being qualified under this rule, Robert was a licensed realtor for thirteen or fourteen years, and was in the business of buying and selling property.   Because Robert was entitled to express an opinion about value, the trial court could not have credited an opposing affidavit about value for purposes of rendering summary judgment.   See, *e.g.*, *Finn v. Nationwide Agribusiness Ins. Co.*, Allen App. No. 1-02-80, 2003-Ohio-4233, ¶ 39 (holding that when trial courts choose between competing affidavits and testimony, they   improperly determine credibility and weigh evidence contrary to summary judgment standards).

{¶ 86} Furthermore, if the $115,000 in loan proceeds was not fraudulently conveyed, then that amount, along with the existing $50,000 lien, would have totaled $165,000 in debt against the Mad River property.   If Robert's testimony is believed, the value of the Mad River property at the time of the March 2004 transfer was zero, because the existing loans, for which the trust was obligated, equaled the fair market value of the property.

{¶ 87} As with the $115,000 loan, Robert Carmack's testimony presents genuine issues of material fact regarding whether the transfer was exempted by R.C. 1336.08(A), which provides that a transfer is not fraudulent against a person who "took in good faith and for a reasonably equivalent value."   There are genuine issues of material fact regarding whether Robert received anything of value in March 2004, given the existing mortgages on the property, his existing obligation to pay those loans, and the lack of any income being generated by the trust.   Once Robert repaid the loans, his ownership of the property would have resulted in no net gain.

{¶ 88} Accordingly, the trial court erred in rendering summary judgment in favor of IBS and CMC with regard to the March 2004 transfer of the Mad River property to Robert.

C.  Transfer of the Key West Property to Sunset

{¶ 89} The trial court found five badges of fraud regarding the transfer of the Key West Property to Sunset.   This property was purchased in April 2001, for a price of $239,000, plus $3,000 in closing costs.   Robert's uncontroverted testimony is that he paid $46,646 in cash as a down payment, and that a $191,000 mortgage was obtained from Independent Mortgage Company.   November 23, 2005 deposition of Robert Carmack, pp. 89-90, and 102.

  According to Robert, Sunset was established as a limited liability corporation before the Key West Property was purchased, for liability protection, because the Carmacks intended to rent out the property and wanted to limit potential liability.   Id. at 93. This was part of their estate planning.   Id.

{¶ 90} Between 2001 and 2004, when the Key West Property was sold, Robert's company, CRM, invested $60,000 in the property.   The distributions were recorded and tracked by CRM's accountant.   Id. at 105-06.

{¶ 91} In January 2003, Robert and Danies signed a quit-claim deed, transferring their interest in the Key West Property to Sunset.   On the same day, Danies transferred her membership interest in Sunset to Robert.   Id. at 119-21.   Robert testified that the fair market value of the property at the time was approximately $290,000.   Id. at 109-10.   Robert stated that Danies' interest was transferred because he was the breadwinner, and it was his money and his debt.   He made all the payments.   Robert also testified that he instigated the purchase of the property and that Danies' obligations were relieved by the transfer of her interest.   Id. at

126.

{¶ 92} Robert further indicated that Danies did not receive anything from this transfer, because the Carmacks owed more on the property at the time than it was worth. Id. at 127-28. In addition, the Sunset corporate minutes contained a written statement that Danies would be held harmless for any liabilities that arose from the Key West Property. Id. at 128-29.

{¶ 93} The transfers were not recorded until September 23, 2003. Robert testified that the fair market value of the Key West Property at that time was the same as it was in January 2003. Id. at 109-10. As with the Mad River Property, IBS and CMC submitted the report of an appraiser, who indicated that the fair market value of the Key West Property in September 2003, was $380,000. The appraiser did not estimate the fair market value as of January 2003, when the transfers occurred.

{¶ 94} Like the previous transfers of property and loan proceeds, the evidence contains indicia of several badges of fraud, because a lawsuit was pending against Danies, even though judgment had not yet been rendered, the transfer was made to an insider, and so forth. However, there are also issues of fact regarding whether the value of the consideration, including limitation of liability, that Danies received, "was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred." R.C. 1336.04(B)(8). The trial court recognized this factual issue, but then relied on R.C. 1336.05 to conclude that Danies did not receive equivalent value for the transfer and that she was insolvent at the time. The court also relied on the $380,000 value assessed by the IBS and CMC appraiser, to find that Danies' interest in the Key West property was $94,400, or one-half of the difference

between the appraiser's value and the lien on the property.

{¶ 95} The trial court erred in disregarding the factual issue, and its analysis is flawed in several other respects. R.C. 1336.05 requires proof of both elements: (1) that a debtor made the transfer without receiving a reasonably equivalent value; and (2) that the debtor was insolvent at the time or became insolvent as a result of the transfer.

{¶ 96} The transfer of the Key West Property did not occur at a time when Danies was insolvent. In January 2003, no judgment had yet been rendered against Danies, and IBS and CMC did not present evidence that any other judgments were then pending against Danies.

{¶ 97} In January 2003, the Mad River Property was in the trust, and the $115,000 loan had not yet been obtained. We have previously concluded that the trust assets could be considered, because Danies could have been forced to revoke the trusts to pay creditors. Using the same logic, Danies would have had available assets of approximately $115,000 in January 2003. (This would be the $165,000 fair market value of the Mad River property, minus the existing $50,000 lien to Union Savings Bank). This amount exceeds even the most liberal estimate of Danies' equity in the Key West Property – the $94,400 figure that the trial court used. Accordingly, one prong of R.C. 1336.05 cannot be satisfied, because Danies was not insolvent in January 2003, and she did not become insolvent as a result of the transfer.

{¶ 98} Furthermore, the trial court failed to consider Robert's testimony regarding the fair market value of the Key West Property. As was previously noted, Robert was qualified to testify about the fair market value of his property. The trial court ignored Robert's deposition testimony, which estimated the value of the Key West Property at around $290,000. In view of the existing mortgage of approximately $191,000, and the $46,646 down payment

made by Robert, Danies' potential equity in the premises in January 2003, would have been half of $52,354, or $26,177. This figure is substantially below the value of the assets in the trust. Even if Robert's down payment is excluded, Danies' equity would have only been about $49,500, a figure that again, is below the value of the trust assets.

{¶ 99} Other factual issues exist concerning whether Danies received a reasonably equivalent value. Danies continued to reside in the premises at no cost, and all expenses were paid, including utilities, condominium fees, and so on. November 23, 2005 deposition of Robert Carmack, pp. 118 and 125-26. While these facts may be viewed as evidence of badges of fraud, they also can be interpreted as a benefit or consideration to Danies.

{¶ 100} See *In re Hanson, supra*, which notes that value can be " 'in the form of either a direct economic benefit or an indirect economic benefit.' " 373 B.R. 522, 526, quoting from *In re Wilkinson* (C.A. 6, 2006), 196 Fed. Appx. 337, 342.

{¶ 101} And finally, Danies received a written statement, in the form of the corporate minutes, that she would be held harmless for any debt or any future liability arising from use of the premises. The trial court recognized that a limitation of liability can be consideration, but then disregarded this fact in ruling on summary judgment.

{¶ 102} A trier of fact may weigh credibility and choose what set of facts to believe, but not when it decides motions for summary judgment. We also note that the judge who heard testimony at the damages hearing concluded that there was evidence before the court "demonstrating that the conveyances were in the normal course of business and for 'estate planning'." April 23, 2010 Decision/Judgment Entry on Compensatory Damages/Punitive Damages/Attorney Fees, p. 3.

{¶ 103} In light of the preceding discussion, the trial court erred in rendering summary judgment against defendants in connection with the transfer of the Key West Property.

D. Key West Property Proceeds Transfer

{¶ 104} The final issue addressed by the trial court is the matter of $98,503.69 in funds that were borrowed in October 2003, using the Key West Property as security. The trial court found four badges of fraud regarding this transfer, which involves a home equity consumer open-end agreement signed by Danies and Robert, with a credit limit of $100,000. After signing this agreement in October 2003, the Carmacks received approximately $75,000 from Orion Bank. November 23, 2005 Deposition of Robert Carmack, p. 140. Robert stated that he needed the proceeds from this loan to subsidize the Skyway Shopping Center that he had purchased, and for other business expenses. Id. at 142-43. Although Danies did not have an ownership interest in the Key West property at the time, she did sign the mortgage note as a borrower.

{¶ 105} Ultimately, when the Key West property was sold in August 2004, for $537,000, Orion Bank was paid $98,503.69 in satisfaction of the mortgage. After payment of mortgages and debts to CRM and Robert ($60,000 and $45,800, respectively), Sunset received approximately $126,000 in cash. Id. at 150-51. That money was then used to finance the purchase of the Toulouse Property in Dayton, where the Carmacks resided at the time of the fraudulent conveyance lawsuit. Id. at 151.

{¶ 106} Danies did not have an ownership interest in either the Key West Property or Sunset when the Orion loan was obtained. The conclusion that the transfer of the Orion funds

was fraudulent is, therefore, contingent upon a finding that the transfer of property to Sunset was fraudulent. Because we have already concluded that genuine issues of material fact preclude summary judgment regarding the transfer to Sunset, summary judgment is also improper with respect to the proceeds from the Orion Bank loan. Accordingly, the trial court erred in rendering summary judgment on this point.

{¶ 107} Defendants also contend that the trial court erred in refusing to consider the affidavits of Robert and Danies, which were attached to their reply to the summary judgment motion. The trial court concluded that these affidavits fail to comply with Civ. R. 56(E), because they do not set forth specific facts and are conclusory. The affidavits refer generally to the facts outlined in the reply memorandum, and state that all the facts are true. In addition, the affidavits generally state that where a statement of fact or assertion rested on advice of legal counsel, Danies and Robert relied on the advice of counsel. The affidavits also indicate that they are based on the personal knowledge of the affiant.

{¶ 108} We decline to address this point, because the depositions, which were on file and available to the court, contain evidence indicating that genuine issues of material fact exist. Defendants also referred to specific deposition pages in their memorandum. Defendants could have been more effective in their affidavits, but the evidence is in the record. We do note that, in general, filing affidavits that incorporate statements in memoranda or pleadings is not appropriate. See, *Climaco, Seminatore, Delligatti & Hollenbaugh v. Carter* (1995), 100 Ohio App.3d 313, 320-321.

{¶ 109} The First Assignment of Error is sustained.

III

{¶ 110} The defendants' Second Assignment of Error is as follows:

{¶ 111} "THE TRIAL COURT ERRED BY FAILING TO RECONSIDER ITS DECISION GRANTING SUMMARY JUDGMENT."

{¶ 112} Under this assignment of error, the defendants contend that the trial court erred in failing to reconsider the summary judgment decision. The motion for reconsideration was filed by Sunset about two years after summary judgment was rendered, and slightly more than two months before the damages hearing was held. The motion raised the issue of whether the Key West Property is protected under the Florida Homestead Exemption. In support of the motion, Danies submitted an affidavit stating that from March 2001, through August 2004, Florida was the Carmacks' primary residence. Danies also attached a copy of her Florida driver's license, which was issued in 2003. The trial court overruled the motion, based on untimeliness, and on the merits. In addition, the court rejected a contention, made at the damages hearing, that IBS and CMC should have named the revocable trust as a party.

{¶ 113} On appeal, defendants contend that the payments to Danies Carmack from IBS were dividends, as opposed to loans; that the Florida Homestead Exemption applies to the Key West Property; and that the trial court could not award damages regarding the transfer of the Mad River Property, because the trust was not made a party to the action.

{¶ 114} We need not consider these issues, because the case is being reversed and remanded for trial, based on genuine issues of material fact regarding whether the alleged transfers were fraudulently made.

{¶ 115} The Second Assignment of Error is overruled as moot.


IV

{¶ 116} The defendants' First Assignment of Error having been sustained, and their Second Assignment of Error having been overruled as moot, the judgment of the trial court is Reversed, and this cause is Remanded for further proceedings.

. . . . . . . . . . . . .

DONOVAN, J., concurs.

GRADY, P.J., dissenting:

{¶ 117} Neither Danies Carmack nor her trust received anything of value in exchange for their 2003 "loan" to Danies' husband, Robert Carmack, of the $115,000 in mortgage loan proceeds on the Mad River Road property owned by the trust, or from the 2008 transfer of title to the Mad River Property from the trust to Robert. Robert subsequently refinanced the $115,000 loan and another $50,000 mortgage loan on the Mad River Road property. By repaying the $115,000 mortgage loan, Robert benefitted himself, not Danies or her trust. Robert retains the benefit of the $115,000 "loan" from the trust, which is nothing more than a promise to pay which is unsecured and possibly unenforceable for the benefit of the trust pursuant to the statute of frauds.

{¶ 118} Danies and Robert transferred their joint interest in the Florida property in 2003 to Sunset, a company Robert owns. Several months later, Sunset obtained a mortgage loan on the property in the amount of $93,503.69. Robert retained the loan proceeds. Danies received nothing. When in 2004 Sunset sold the property, Robert retained the net

proceeds of the sale and applied those proceeds to purchase a residential property on Toulouse Circle in Dayton. Robert holds title to the Toulouse Circle property. Danies obtained no value from these transactions except the right to reside in the Toulouse Circle property.

{¶ 119} Reasonable minds could not find that, in exchange for the interests she transferred, Danies received any tangible asset having a value reasonably equivalent to the value of the interests in assets she transferred that can be applied to satisfy the judgment against her, because Danies received no value at all. Neither does the fact that Robert does business in this way, for his own benefit, demonstrate that in exchange Danies received anything. I would affirm the summary judgments on the fraudulent transfer claims against Danies, Robert, and Sunset.

. . . . . . . . . . . . .


Copies mailed to:

David C. Greer
Richard B. Reiling
Hon. James F. Stevenson
(sitting for Hon. Michael T. Hall)