[Cite as *Individual Business Servs. v. Carmack*, 2013-Ohio-4819.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

INDIVIDUAL BUSINESS SERVICES, : 
et al.                              :            Appellate Case No. 25286
                                    :
        Plaintiffs-Appellees        :            Trial Court Case No. 2004-CV-8159
                                    :
v.                                  :
                                    :            (Civil Appeal from
DANIES CARMACK, et al.      :        Common Pleas Court)
                                    :
        Defendants-Appellants       :
                                    :

. . . . . . . . . . .

O P I N I O N

Rendered on the 1st day of November, 2013.

. . . . . . . . . . .

DAVID C. GREER, Atty. Reg. #0009090, and CARLA J. MORMAN, Atty. Reg. #0067062, Bieser, Greer & Landis, LLP, 400 PNC Center, 6 North Main Street, Dayton, Ohio 45402-1908
        Attorneys for Plaintiffs-Appellees

RICHARD B. REILING, Atty. Reg. #006618, 5045 North Main Street, Suite 320-D, Dayton, Ohio 45415
        Attorney for Defendants-Appellants

. . . . . . . . . . . .

FAIN, P.J.

{¶ 1}    Defendants-appellants Danies Carmack, the Estate of Robert Carmack, and Sunset Cottages, LLC, appeal from a judgment rendered in favor of plaintiffs-appellees International Business Systems, Inc., and Citizens Motorcar Company d/b/a America's

Packard Museum. The trial court concluded that transfers of property involving the defendants in 2003 and 2004 were fraudulent, and awarded judgment against defendants, jointly and severally, in the amount of $192,055.61, plus interest and costs. Defendants contend that the trial court erred in refusing to find that certain property was exempted under Florida and Ohio state laws. Defendants also contend that the trial court erred in rendering judgment for the plaintiffs, because the defendants presented evidence that the conveyances at issue were made in the ordinary course of business and for estate planning purposes. Defendants further contend that the trial court erred in finding that all three defendants were jointly and severally liable for the entire judgment. Finally, defendants contend that the trial court erred by not determining the value of the properties at issue on the dates of transfer.

{¶ 2} We conclude that the trial court did not err in rendering judgment against the defendants, jointly and severally, in the amount of $192,055.61, plus interest and costs. Accordingly, the judgment of the trial court is Affirmed.

## I. Course of the Proceedings

{¶ 3} A lengthier recitation of the underlying facts and procedural history is set forth in our opinion in *Individual Business Services v. Carmack*, 2d Dist. Montgomery No. 24085, 2011-Ohio-1824. We repeat some of the pertinent facts here.

{¶ 4} In 2000, Danies Carmack owned and operated Individual Business Systems, Inc. (IBS). Danies had owned IBS for about fifteen years, and had worked there for twelve years before becoming the sole shareholder, owner, and director of the company. Danies decided to retire in 2000. Danies and her husband, Robert Carmack, decided to donate IBS to Citizens

Motorcar Company d/b/a America's Packard Museum (CMC), at the suggestion of Robert Signom, an attorney who had done legal work for IBS.

{¶ 5}    Danies donated IBS to CMC in December 2000. At the time, IBS's books reflected loans amounting to $192,055.61 that had been made to Danies.   Danies denied any intention to donate the loans as well as the business.   However, the Carmacks took a charitable deduction of about $356,000 for the donation, which included the value of the loans.

{¶ 6}    In June 2002, First National Bank of Southwestern Ohio (First National) sued IBS, CMC, and Danies for breach of a commercial lease, alleging that the lease had not been paid in the months of February through June 2002.   *See First National Bank of Southwestern Ohio v Individual Business Services, Inc.,* Montgomery County Common Pleas Case No. 02CV3956. Based upon the alleged breach, First National elected to declare the entire amount of the lease due, which was $47,900.27.   Danies was included in the suit, because she had allegedly signed the lease as an unconditional guarantor.

{¶ 7}    In August 2002, IBS and CMC filed a cross-claim against Danies and a third-party complaint against Robert.   IBS and CMC alleged that Danies had wrongfully removed monies from IBS in early 2001.   IBS and CMC further alleged that Danies had withdrawn about $196,000 from IBS prior to December 2000, and had designated the amounts as loans to shareholders, rather than as income.

{¶ 8}    Robert Carmack was involved in development work for nonprofit corporations. Robert was licensed in real estate, and had been buying and selling properties from the time he and Danies were married in 1967.

{¶ 9}    In January 2003, First National moved for summary judgment against IBS and

Danies. In April 2003, the trial court rendered summary judgment against IBS, concluding that IBS was in default of the lease agreement. IBS and CMC also moved for summary judgment against Danies and Robert. In July 2003, the trial court rendered summary judgment against Danies on IBS's and CMC's third claim for relief, which sought judgment based on the loan/account receivable on the IBS books for $192,055.61. Danies moved for reconsideration, unsuccessfully. Danies appealed from the judgment of the trial court. We dismissed that appeal for lack of prosecution. *First National Bank of Southwestern Ohio v. Individual Business Services, Inc.*, Montgomery App. No. 20177 (March 8, 2004).

{¶ 10} Subsequently, in late November 2004, IBS and CMC brought this action against Danies, Robert, and an entity called Sunset Cottages, LLC (Sunset). The complaint contained five counts. The first two counts alleged that Danies, as trustee of a revocable trust, had fraudulently transferred her interest in 5188 Mad River Road (Mad River Property) to Robert on March 2, 2004, in violation of R.C. 1336.04 and R.C. 1336.05. The third and fourth counts alleged that Danies had fraudulently transferred her interest in a Key West condominium (Key West Property) to Sunset in January 2003, in violation of R.C. 1336.04 and R.C. 1336.05. Finally, the fifth count alleged that Robert and Sunset had been unjustly enriched by the transfers, and should be held to be constructive trustees of all money or property received from Danies. IBS and CMC requested $192,055.61, plus interest from July 31, 2003, punitive damages, attorney fees, the imposition of a constructive trust, attachment of the certificate of judgment to various properties, and a declaration that IBS and CMC could levy execution of judgment against the Mad River Property and against property at 4404 Toulouse Court in Dayton, Ohio, which Robert and Sunset had purchased in September 2004 (Toulouse Property).

{¶ 11} IBS and CMC subsequently moved for summary judgment. In February 2008, the trial court rendered summary judgment in favor of IBS and CMC. The court held the following transfers to have been fraudulent: (1) The transfer of $115,000 in loan proceeds to Robert on July 30, 2003; (2) the transfer of the Mad River Property from the trust to Robert in March 2004; (3) the transfer of the Key West Property to Sunset in January 2003; and (4) the transfer of the proceeds from a sale of the Key West Property in repayment of a loan taken out in October 2003.

{¶ 12} In January 2009, the Montgomery County Common Pleas Court dismissed the fraudulent conveyance action without prejudice, due to a federal bankruptcy filing. In July 2009, a suggestion of death was filed, indicating that Robert Carmack had died in June 2009. The case was then reactivated in August 2009, and Robert's estate was substituted as a defendant.

{¶ 13} The trial court held a bench trial to determine whether punitive damages should be awarded, and if so, in what amount. The court rejected plaintiffs' punitive damages request, concluding that a finding of fraudulent conveyance alone is not sufficient to award punitive damages. The court concluded that IBS and CMC had failed to establish by clear and convincing evidence that Robert's and Danies' conduct was with malice sufficient to award punitive damages.

{¶ 14} The trial court rendered judgment in May 2010 against Danies, the Estate of Robert Carmack, and Sunset, in the amount of $192,055.61, plus interest from July 31, 2003. In addition, the court ordered that the judgment would constitute a lien as of November 24, 2004, against the Mad River and Toulouse properties. Danies, the Estate of Robert Carmack, and Sunset appealed.

**{¶ 15}**　We reversed the summary judgment, concluding that genuine issues of material fact existed with regard to the issue of whether the property at issue had been fraudulently transferred. *Individual Business Services v. Carmack*, 2d Dist. Montgomery No. 24085, 2011-Ohio-1824. Consequently, we reversed the judgment of the trial court on the issue of the fraudulent transfers only, and remanded the cause to the trial court for further proceedings.

**{¶ 16}**　On remand, the trial court held a bench trial. The trial court held that the transfers of the Mad River Property and the Key West Property were fraudulent transfers. The trial court rendered judgment against defendants, jointly and severally, in the amount of $192,055.61, plus interest and costs. From this judgment, defendants appeal.

### II. The Key West Property Was Not the Homestead of Danies, and Therefore Is Not Exempt Property

**{¶ 17}**　Defendants' First Assignment of Error states:

THE TRIAL COURT ERRED BY FINDING THAT THE APPELLEES HAD ANY INTEREST IN THE KEY WEST CONDO AS THIS PROPERTY IS EXEMPTED UNDER FLORIDA LAW.

**{¶ 18}**　Defendants contend that the trial court erred in finding that the plaintiffs had any interest in the Key West Condo, because the property was exempt under Florida law as the primary residence and homestead of Danies Carmack. Furthermore, under Ohio law, exempt property "is not susceptible of fraudulent alienation." Appellants' Brief, p. 13.

**{¶ 19}**　Defendants' contention is based on the premise that the Key West Property was the primary residence of Danies Carmack. The trial court, however, rejected this argument,

finding:

> Defendants contend that they are entitled to a homestead exemption from the State of Florida as residents of Florida. This Court finds that the preponderance of the evidence shows that the Defendants were Ohio residents. Other than obtaining a Florida driver's license, all other indicia of residency suggests that the Defendants were residents of the State of Ohio.

April 23, 2010 Decision Denying Motion to Reconsider, p. 2.

{¶ 20} Defendants contend that the testimony of Danies Carmack and her daughters established that Danies' primary residence was in Florida. Implicit in the trial court's ruling is a rejection of this testimony as not credible. The credibility of the witnesses and the weight to be given to their testimony are primarily matters for the trier of facts to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).

{¶ 21} We have reviewed the entire record, including the testimony presented at trial. We defer to the trial court's credibility determinations. Based on our review of the record, we conclude that the trial court's finding that Carmack's primary residence was in Ohio, not Florida, is not against the manifest weight of the evidence. Therefore, the trial court did not err by

finding that the plaintiffs could attack the transfer of the Key West Property as a fraudulent transfer.

**{¶ 22}** Defendants' First Assignment of Error is overruled.

### III. The Transfer of the Key West Property Exhibited Several Badges of Fraud and Defendants Failed to Rebut the Resulting Presumption of Fraud

**{¶ 23}** Defendants' Second Assignment of Error states:

THE TRIAL COURT ERRED BY DETERMINING THAT THE TRANSFER OF THE KEY WEST CONDO WAS FRAUDULENT UNDER R.C. § 1336.04.

**{¶ 24}** The trial court found that the transfer of the Key West Property to Sunset was fraudulent pursuant to R.C. 1336.04, which provides that:

(A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor;

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:

(a) The debtor was engaged or was about to engage in a business or a

transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;

(b) The debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

{¶ 25}  "[D]irect proof of fraud is seldom possible to obtain."  *K-Swiss, Inc. v. Cowens Sports Center, Inc.*, 2d Dist. Greene No. 95-CA-48, 1995 WL 655945, *9 (Nov. 8, 1995). "Consequently, '[d]ue to the difficulty in finding direct proof of fraud, courts of this state began long ago to look to inferences from the circumstances surrounding the transaction and the relationship of the parties involved.'" *Id.*, quoting *Stein v. Brown*, 18 Ohio St.3d 305, 308-309, 480 N.E.2d 1121 (1985).  R.C. 1336.04(B) provides the following eleven-factor test to prove actual intent to defraud creditors:

In determining actual intent under division (A)(1) of this section, consideration may be given to all relevant factors, including, but not limited to, the following:

(1) Whether the transfer or obligation was to an insider;

(2) Whether the debtor retained possession or control of the property transferred after the transfer;

(3) Whether the transfer or obligation was disclosed or concealed;

(4) Whether before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;

(5) Whether the transfer was of substantially all of the assets of the debtor;

(6) Whether the debtor absconded;

(7) Whether the debtor removed or concealed assets;

(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset  transferred or the amount of the obligation incurred;

(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred;

(11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

{¶ 26}  These eleven factors in R.C. 1336.04(B) are referred to as "badges of fraud." "'Badges of fraud' are circumstances so frequently attending fraudulent transfers that the inference of fraud arises from them." *Cardiovascular & Thoracic Surgery of Canton, Inc. v. DiMazzio*, 37 Ohio App.3d 162, 166, 524 N.E.2d 915 (5th Dist.1987).  We have previously noted that a plaintiff does not have to show evidence of all the badges of fraud in order to meet the intent requirement of R.C. 1336.04(A).   *Gevedon v. Ivey*, 172 Ohio App.3d 567, 2007-Ohio-2970, 876 N.E.2d 604, ¶ 76 (2d Dist.).   "While the existence of one or more badges does not constitute fraud per se, * * * a complaining party is not required to demonstrate the presence of all badges of fraud; as few as three badges have been held to constitute clear and convincing evidence of actual fraudulent intent."  (Citation omitted.) *Blood v. Nofzinger*, 162 Ohio App.3d 545, 2005-Ohio-3859, 834 N.E.2d 358, ¶ 49 (6th Dist.).

**{¶ 27}** The burden of proof in actions to set aside a fraudulent conveyance, "must be affirmatively satisfied by the complainant." *Stein v. Brown*, 18 Ohio St.3d 305, 308, 480 N.E.2d 1121 (1985) (Citation omitted.) However, if the party alleging fraud demonstrates "a sufficient number of badges, the burden of proof then shifts to defendant to prove that the transfer was not fraudulent." *Baker & Sons Equip. Co. v. GSO Equip. Leasing, Inc.*, 87 Ohio App.3d 644, 650, 622 N.E.2d 1113 (10th Dist.1993), citing *Cardiovascular & Thoracic Surgery of Canton, Inc.* Pursuant to R.C. 1336.08(A), a party that demonstrates that it participated in the transfer in good faith and paid reasonably equivalent value rebuts the presumption of fraud created by the badges of fraud. *Baker & Sons* at 650-651.

**{¶ 28}** The evidence presented to the trial court contains indicia of several badges of fraud relating to the transfer of the Key West Property. First, the transfer of the Key West Property was to an insider. R.C. 1336.04(B)(1). Second, Danies continued to reside in or use the Key West Property after the transfer was made. R.C. 1336.04(B)(2). Third, the transfer of the Key West Property was concealed as the deed was executed in January 2003, but not recorded until September 2003. R.C. 1336.04(B)(3). Fourth, a lawsuit was filed against Danies Carmack in 2002, before the transfer of the Key West Property was made. R.C. 1336.04(B)(4). Fifth, Danies arguably was insolvent at the time of the transfer of the Key West Property. R.C. 1336.04(B)(5). Sixth, the transfer of the Key West Property by Danies took place "shortly before or shortly after a substantial debt was incurred." R.C. 1336.04(B)(10).

**{¶ 29}** Given these several badges of fraud, the burden shifted to defendants to prove the transfer of the Key West Property was not fraudulent. Defendants contend that they carried their burden by showing that the transfer of the Key West Property was made in the ordinary course of

furthering business interests.   Furthermore, defendants contend that the transfer of the Key West Property was supported by consideration in that Robert Carmack agreed to hold Danies harmless regarding any debt owed on the property and that he would pay Danies' living expenses. Regarding the latter argument, the trial court could reasonably have found that Robert Carmack's willingness to hold Danies harmless with respect to debts secured by the property and his willingness to pay her living expenses were the incidents of a normal marital relationship, rather than consideration for the transfer.

{¶ 30}  Defendants contend that "as the Trial Court itself noted in its April 23, 2010 decision denying punitive damages and attorney fees, the evidence before the Trial Court was that both of the subject conveyances were made in the 'normal course of business and for estate planning' purposes."  Brief, p. 17.  This is not correct.  In its April 23, 2010 Decision/Judgment Entry on Compensatory Damages/Punitive Damages/Attorney Fees, the trial court stated, in part:

> There is no question that the Defendants were angry and felt betrayed by Robert Signom.  Their conduct, including the website and the disciplinary complaints show that, and Defendants have conceded their anger.  However, being merely angry is not sufficient in this court's opinion to demonstrate the kind of malice necessary to award punitive damages.  It is certainly understandable, rightly or wrongly, that a defendant might be angry and upset when a plaintiff seeks and obtains a judgment. The Defendants contend that the transfers were merely performed in the normal course of business.  *There is evidence before this Court demonstrating that the conveyances were in the normal course of business and for "estate planning," as well as this court's finding of an effort to defeat*

*creditors. Merely transferring property to defeat creditors does not, in this court's opinion, support a claim for punitive damages.*

*Id.* at p. 3 (Emphasis added.)

{¶ 31} In its decision denying the request for punitive damages, the trial court noted that there was evidence submitted that the conveyances were in the normal course of business *and* that the transfers were made to defeat creditors. But the trial court ultimately determined that the evidence that the transfers were made to defeat creditors outweighed the evidence that the conveyances were in the normal course of business. We conclude that the trial court's finding on this matter was amply supported by the numerous badges of fraud. The trial court determined that the testimony of Robert and Danies that Robert had agreed to hold Danies harmless regarding any debt on the Key West Property and to pay Danies' living expense was not sufficient to overcome the presumption of fraud created by the numerous badges of fraud present in this case.

{¶ 32} Robert Carmack also explained that the limited liability company, Sunset Cottages LLC, was set up to avoid premises liability. While it may be true that this company may originally have been formed for the purpose of limiting potential premises liability, this does not necessarily mean that the transfer of the Key West Property to Sunset was intended solely to limit premises liability. The trial court did not find this testimony sufficient to overcome the numerous badges of fraud.

{¶ 33} Based on our review of the record, including the numerous badges of fraud, and deferring to the trial court's credibility determinations, we conclude that the trial court's finding that the transfer of the Key West Property was a fraudulent transfer pursuant to R.C. 1336.04 is

not against the manifest weight of the evidence.

{¶ 34} Defendants' Second Assignment of Error is overruled.

## IV. The Transfer of the Mad River Property Exhibited Several Badges of Fraud and Defendants Failed to Rebut the Resulting Presumption of Fraud

{¶ 35} Defendants' Third Assignment of Error states:

THE TRIAL COURT ERRED BY HOLDING THAT THE TRANSFER OF THE MAD RIVER PROPERTY FROM THE TRUST TO ROBERT CARMACK WAS FRAUDULENT UNDER R.C. § 1336.04.

{¶ 36} The trial court found that the transfer of the Mad River Property by Danies, as trustee of a revocable trust, to Robert Carmack was fraudulent under R.C. 1336.04. Our analysis in this assignment of error is guided again by the badges of fraud listed in R.C. 1336.04(B). The trial court found a number of badges of fraud present. First, the transfer was made to an insider. R.C. 1336.04(B)(1). Second, Danies retained possession of the property and continued to live there after the property was transferred. R.C. 1336.04(B)(2). Third, the transfer was made approximately eight months after plaintiffs obtained a judgment for $192,055.61 against Danies. R.C. 1336.04(B)(4) and (10). Fourth, the transfer of the Mad River Property was of substantially all of Danies Carmack's assets. R.C. 1336.04(B)(5). Fifth, Robert Carmack gave no new consideration for this transfer. R.C. 1336.04(B)(8). Sixth, Danies Carmack was insolvent at the time of the transfer of the Mad River Property, given that she had a judgment of over $192,000 against her at the time of the transfer. R.C. 1336.04(B)(9).

{¶ 37} In response to these badges of fraud, defendants contend that there were

non-fraudulent reasons for the transfer that should outweigh the numerous badges of fraud. First, the transfer of the Mad River Property was a routine practice of Robert Carmack as part of his real estate investment business. But, as the trial court pointed out, in previous transactions the property that was transferred from the revocable trust was transferred to the joint ownership of Danies and Robert Carmack. The transfer of the Mad River Property, however, was solely to Robert Carmack, which would insulate the property from a claim by a creditor of Danies Carmack. Second, Robert agreed to hold Danies harmless for any loans on the Mad River Property and to continue to pay Danies' living expenses. The trial court did not find it credible that these agreements were consideration for the transfer.

{¶ 38} Based on our review of the record, including the numerous badges of fraud, and deferring to the trial court's credibility determinations, we conclude that the trial court's finding that the transfer of the Mad River Property was a fraudulent transfer pursuant to R.C. 1336.04 is not against the manifest weight of the evidence.

{¶ 39} Defendants' Third Assignment of Error is overruled.

## V. Based on the Particular Circumstances of this Case, the Trial Court Could Find the Defendants Jointly and Severally Liable for the Entire Judgment Amount

{¶ 40} Defendants' Fourth Assignment of Error states:

THE TRIAL COURT ERRONEOUSLY FOUND THE PARTIES JOINTLY AND SEVERALLY LIABLE FOR THE ENTIRE AMOUNT OF THE 2003 JUDGMENT AGAINST DANIES.

**{¶ 41}** The trial court found defendants jointly and severally liable in the amount of $192,055.61 plus interest and costs. Defendants contend that the trial court "erred by holding all three Appellants liable for the entire amount of the 2003 judgment rendered against Danies." Brief, p. 19.

**{¶ 42}** R.C. 1336.08 (B) provides guidance regarding the compensation due a creditor harmed by a fraudulent transfer. That section provides:

(1) Except as otherwise provided in this section, to the extent a transfer is voidable in an action by a creditor * * *, the creditor or agency may recover a judgment for the value of the asset transferred, as adjusted under division (B)(2) of this section, or the amount necessary to satisfy the claim of the creditor or agency, whichever is less. The judgment may be entered against either of the following:

(a) The first transferee of the asset or the person for whose benefit the transfer was made;

(b) Any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee.

(2) If the judgment under division (B)(1) of this section is based upon the value of the asset transferred, *the judgment shall be in an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require.* (Emphasis added.)

**{¶ 43}** R.C. 1336.07 also guides courts regarding what a creditor may recover in an action against a debtor who has engaged in fraudulent conveyances. That section provides:

(A) In an action for relief arising out of a transfer or an obligation that is

fraudulent under section 1336.04 or 1336.05 of the Revised Code, a creditor or a child support enforcement agency on behalf of a support creditor, subject to the limitations in section 1336.08 of the Revised Code, may obtain one of the following:

(1) Avoidance of the transfer or obligation to the extent necessary to satisfy the claim of the creditor;

(2) An attachment or garnishment against the asset transferred or other property of the transferee in accordance with Chapters 2715. and 2716. of the Revised Code;

(3) *Subject to the applicable principles of equity and in accordance with the Rules of Civil Procedure, any of the following*:

(a) An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

(b) Appointment of a receiver to take charge of the asset transferred or of other property of the transferee;

(c) *Any other relief that the circumstances may require.* (Emphasis added.)

{¶ 44} Finally, R.C. 1336.10 provides the following further guidance: "Unless displaced by this chapter, the principles of law and equity, including, but not limited to, the law merchant and the law relating to principal and agent, estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency, or other validating or invalidating cause, supplement the provisions of this chapter."

{¶ 45} In *Aristrocrat Lakewood Nursing Home v. Mayne*, 133 Ohio App.3d 651, 729

N.E.2d 768 (8th Dist.1999), the court explained that the amount of recovery in a fraudulent transaction case is not always limited by the amount of the fraudulent transaction. The 8th District Court of Appeals explained, at 671-672:

In many cases, as set forth in R.C. 1336.07(A)(1), the maximum measure of recovery to compensate an injured creditor would be the amount of the fraudulent transfer because that amount would equal the amount of the loss caused by the fraudulent transfer. However, at its core, the guiding principle is compensation. Depending upon the facts and circumstances of a particular case, the amount of the fraudulent transfer may either under or overcompensate the injured creditor.

For example, it is well established that "[a] person injured by fraud is entitled to such damages as will fairly compensate him for the wrong suffered; that is, the damages sustained by reason of the fraud or deceit, and which have naturally and proximately resulted therefrom." *Foust v. Valleybrook Realty Co.* (1981), 4 Ohio App.3d 164, 166, 4 OBR 264, 267, 446 N.E.2d 1122, 1126; *Locafrance [U.S. Corp. v. Interstate Dist. Serv., Inc.* (1983), 6 Ohio St.3d 198, 451 N.E.2d 1222], *syllabus, supra.* ("Common-law remedies, including the law of fraud, may be applied when appropriate in fraudulent conveyance cases * * *.") In such a case, to the extent that the amount of the fraudulent transfer does not adequately compensate the injured creditor for its loss, it does not provide the appropriate measure of recovery. R.C. 1336.07(A)(3)(c); R.C. 1336.10.

{¶ 46} In the case before us, the defendants engaged in two fraudulent transactions that

were intended to insulate assets of Danies Carmack from a court judgment in excess of $190,000. R.C. 1336.07, 1336.08, and 1336.10 all highlight the broad powers of a court to fully compensate a creditor damaged by a debtor who has engaged in fraudulent transfers intended to hide or protect assets that would otherwise be available to satisfy the debt owed to the creditor. These sections of the Revised Code allow a court, when faced with fraudulent transfers, to adjust an award "as the equities may require" and grant "[a]ny other relief that the circumstances may require." R.C. 1336.08(B)(2) and 1336.07(A)(3)(c).

**{¶ 47}** All of the defendants in this case were involved in a least one transfer that has been found to be fraudulent. Furthermore, all three of the defendants were closely related to the other defendants and used this special relationship to more efficiently effectuate the fraudulent transfers. As a result, it has taken nearly a decade for plaintiffs to finally obtain the relief they have sought, assuming defendants collectively have sufficient assets to pay the entirety of the judgment. Based on the particular facts before us, we conclude that the trial court did not err in exercising its broad powers to compensate plaintiffs for the harm caused by the fraudulent transfers by finding defendants jointly and severally liable for the entire judgment.

**{¶ 48}** Defendants' Fourth Assignment of Error is overruled.

### VI. The Evidence in the Record Supports the Trial
### Court's Valuations of the Properties Fraudulently Transferred

**{¶ 49}** Defendants' Fifth Assignment of Error states:

THE TRIAL COURT ERRED BY FAILING TO DETERMINE THE VALUE OF THE KEY WEST CONDO AND MAD RIVER PROPERTY ON THE DATES OF TRANSFERS.

{¶ 50}   The trial court found that the value of the Mad River Property was approximately $185,000 and the value of the Key West Property was in excess of $300,000.   In this assignment of error, defendants contend that the trial court failed to determine the exact values of the Mad River Property and the Key West Property on the precise day on which the fraudulent transfers occurred.   According to defendants, "[w]ithout the exact values it [is] not possible to render any judgment against [defendants] let alone a judgment in the full amount of the 2003 judgment." Defendants' Brief, p. 23.   We do not agree.

{¶ 51}   In cases involving fraudulent transfers it is often difficult to prove the exact value of the property transferred on the precise day of transfer, because these transfers typically are not analyzed until years after they occur, especially if the debtor who makes the fraudulent transfer is successful in concealing or insulating the property fraudulently transferred.   As explained in Part V, above, a court is commissioned with broad power to ensure that a creditor damaged by a fraudulent transaction is fully compensated.   Moreover, the recurring theme in R.C. 1336.07, 1336.08, and 1336.10 is that principles of equity should be considered when shaping proper relief to the creditor.

{¶ 52}   We conclude that the trial court properly considered evidence of the value of the properties at or near the time the Mad River Property and the Key West Property were fraudulently transferred.   Although these values may not have been the exact values on the precise days that the properties were transferred, we conclude that the trial court did a more than adequate job of parsing the evidence and making findings that are supported by the record.   And, given the particular circumstances of this case, we conclude the trial court entered a judgment that satisfies the principles of equity and full compensation for a creditor damaged by a

fraudulent transfer.

**{¶ 53}** Defendants' Fifth Assignment of Error is overruled.

### VII. Conclusion

**{¶ 54}** All of the defendants' assignments of error having been overruled, the judgment of the trial court is Affirmed.

. . . . . . . . . . . .

FROELICH and WELBAUM, JJ., concur.


Copies mailed to:

David C. Greer
Carla J. Morman
Richard B. Reiling
Hon. James F. Stevenson
(sitting for Judge Mary K. Huffman)