[Cite as *Klein, Tomb & Collins, L.L.P. v. Epstein*, 2016-Ohio-7325.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MIAMI COUNTY**

KLEIN, TOMB & COLLINS, LLP, et al.          :
                                            :
          Plaintiff-Appellee                :          C.A. CASE NO. 2016-CA-3
                                            :
v.                                          :          T.C. NO. 12CV541
                                            :
JASON EPSTEIN                               :          (Civil Appeal from
                                            :           Common Pleas Court)
          Defendant-Appellant               :
                                            :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___14th___ day of _____October_____, 2016.

. . . . . . . . . .

JEREMY M. TOMB, Atty. Reg. No. 0079554, 124 W. Main Street, Troy, Ohio 45373
          Attorney for Plaintiff-Appellee

P. J. CONBOY II, Atty. Reg. No. 0070073, 5613 Brandt Pike, Huber Heights, Ohio 45424
          Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Jason Epstein appeals from a judgment of the Miami County Court of Common Pleas, which entered judgment in favor of two law firms, Tomb Law, LLC and Klein, Tomb & Eberly, LLC, on their breach of contract claims against him. The trial court also denied Epstein's counterclaims and third-party claims for breach of contract, unjust enrichment and fraud. The court ordered Epstein to pay a total of $12,219.93 to the law

firms, plus interest; he was also ordered to pay court costs.

{¶ 2} For the following reasons, the judgment of the trial court will be affirmed.

## I. Facts and Procedural History

{¶ 3} The law firms of Tomb Law and its successor, Klein, Tomb & Collins, LLP, represented Epstein in dissolution and divorce proceedings beginning in December 2009. (The firm is now known as Klein, Tomb, and Eberly, LLP.) Cheryl Collins, a friend of Epstein, was a new attorney with the law firm at that time, and Epstein asserts that this friendship led him to hire the firm. It is unclear from the record when the divorce proceedings concluded, but Epstein terminated his relationship with the firm in January 2012, after a dispute arose as to the amount he was being billed. Collins left the firm around the same time.

{¶ 4} On February 3, 2012, the firms of Tomb Law and Klein, Tomb, & Collins each filed a complaint against Epstein in the Miami County Municipal Court, alleging breach of contract, unjust enrichment, and seeking the amount owed on his account. Case No. 12 CVF 314 (Tomb Law) and Case No. 12 CVF 313 (Klein, Tomb & Collins). The complaints related to the representation of Epstein in a single domestic relations matter, but they were filed in the names of the two different legal entities (firms) to which the fees were owed. The plaintiff-firms will be collectively referred to as "the law firm." These cases were consolidated in April 2012.

{¶ 5} On April 30, 2012, Epstein filed an Answer and Counterclaims for breach of contract, unjust enrichment, and fraud. In these claims, Epstein objected to the amount he was billed for certain work, the total amount and reasonableness of the bills, the amount incurred for the work of a paralegal and the manner in which it was calculated,

and to bills for "notes to file" that he claimed did not exist.

{¶ 6} In August 2012, Epstein filed a motion for leave to amend his counterclaim and to file a third-party complaint against attorney Jeremy M. Tomb; the amended complaint added a claim for abuse of process. Epstein also asserted that the damages he sought exceeded the $25,000 jurisdictional limit of the municipal court, and he sought to transfer the case to the court of common pleas. The motion to transfer was granted on August 15, 2012. Neither the municipal court nor the court of common pleas expressly ruled on the motion for leave to file an amended complaint or a third-party complaint, but the law firm filed an answer to each in the common pleas court.

{¶ 7} In April 2014, the law firm filed a motion for summary judgment; the trial court denied the motion. The matter was tried to the court on November 18, 2014, and the parties filed post-trial briefs.

{¶ 8} On January 26, 2016, the trial court filed its "Decision and Verdicts." It found in favor of the law firm on the claims for breach of contract and action on account, entering judgment as follows: 1) in favor of Klein, Tomb and Eberly, as successor to Klein, Tomb & Collins, in the amount of $4,780.86 (slightly less than it had sought, for reasons that will be explained below); and 2) in favor of Tomb Law for $7,439.07. Interest was awarded at 18%, as provided in the fee agreement. The court found that the law firm was not entitled to recover for unjust enrichment. With respect to Epstein's counterclaims and third-party complaint, the court found that Epstein had not established a breach of contract, unjust enrichment, fraud, or abuse of process. Thus, the court found for the law firm on the counterclaims and third-party complaint. The court assessed court costs to Epstein.

**{¶ 9}** Epstein appeals from the trial court's judgment; he raises one assignment of error, which asserts that the trial court erred in entering the judgment that it did. Because Epstein's argument challenges the trial court's factual determinations, we construe it as an argument that the judgment was against the manifest weight of the evidence.

## II. The Evidence Presented at Trial

**{¶ 10}** At trial, the law firm presented the testimony of Todd Severt as to the reasonableness of the fees charged; Severt is a "certified specialist in family law" who practices in Troy. Severt reviewed many of the paper records of the case, although he acknowledged that he did not look at every document or compare each billing with the correlated work product.

**{¶ 11}** Severt testified that the amount of billing -- $200 per hour for Tomb's work and $100 per hour for his paralegal – was reasonable for the area and for the work provided; Severt himself billed at a slightly higher rate. Severt described the Epstein divorce as a "fairly typical divorce" with "lots of issues," including Epstein's loss of his job and the attorneys' need to travel to Montgomery County for the proceedings. Severt stated that Tomb "expended a lot of time and effort," and that, in Severt's opinion, Tomb's fees were fair and reasonable.

**{¶ 12}** Tomb testified as to the history of the law firm, his rates, and how he became involved in Epstein's case. According to Tomb, Cheryl Collins, who was a friend of Epstein, was a new attorney with the firm when Epstein sought her assistance with a dissolution. When the case "went south" a few months later, meaning that it became apparent that the case would proceed as a divorce rather than a dissolution, Tomb took

over the case, with assistance from Collins, due to her inexperience. Epstein approved this change.

**{¶ 13}** Tomb described several "complex factors" that arose in the case, although there were "none that [he] wasn't used to dealing with." These issues included 1) Epstein's employment as an independent contractor; 2) his wife's on-again off-again work history and subsequent return to nursing school (presenting a challenge in calculating her expected income); 3) the couple's ownership of two properties – a rental property and a home that was in foreclosure; and 4) the fact that the parties did not agree on parenting time for their two minor children. Tomb also expressed his view that the temporary orders issued by the domestic relations court awarded "excessive amounts of spousal support, child support," as well as full custody to the mother; Tomb described these orders as creating "a pretty deep hole by the time [he] came in the case," meaning, he said, that the orders may have given Mrs. Epstein "unreasonable" expectations about what she would ultimately be awarded and made it more difficult to negotiate "to a place that would be reasonable."

**{¶ 14}** Tomb testified that all of his billing on the case was in conformity with the fee agreement. Tomb also stated that, notwithstanding that he and Epstein occasionally socialized and played volleyball together, Epstein had never "directly contacted" Tomb with any objection to the billing until after Epstein had terminated Tomb's services and been billed for payment in full. The agreement provided that disputed charges should be raised by the client within two months. Epstein's girlfriend did send an email to the firm with a question about billing, but it related to the crediting of previous payments, not the amount of the bill.

{¶ 15}   With respect to the work he performed on the case, Tomb testified that, in addition to the trial, he had attended a hearing on the temporary orders, and had handled discovery, settlement proposals, and a "plethora of other issues" that arose while the case was pending.   These issues included the marital home's going into foreclosure, Epstein's girlfriend's desire to buy the home, dealing with creditors, and addressing ongoing expenses for the children.

{¶ 16}   Tomb stated that, in addition to other communications, he was in contact with Epstein 7 to 10 times per week by chat, text, and/or email, means by which Epstein liked to communicate; many of these communications were not billed.   According to Tomb, Epstein was "extremely high maintenance" and was "by far the most hands on client that [he had] ever represented."   Epstein wanted lots of explanations, seemed appreciative of the personal attention he received, and never complained about Tomb's charges.   Further, Tomb testified that Mrs. Epstein's second attorney was a "pit bull," "extremely aggressive," and difficult to deal with during the legal proceedings.   Epstein himself also refused to agree to certain proposals with respect to parenting time and support that Tomb thought were appropriate and reasonable.

{¶ 17}   Tomb testified about and presented a detailed bill for Epstein's account. Epstein had been billed $19,380.11 by Tomb Law, of which he had paid $11,875.24; Epstein had been billed $7,436.38 by Klein, Tomb & Collins, of which he had paid $1,092.50.   Interest accrued on both bills at a rate of 18% per year.   Epstein owed more than $12,900 when he terminated his relationship with the firm.

{¶ 18}   Tomb also testified about the factors set forth in Ohio Rule of Professional Conduct 1.5(a), as relevant to the reasonableness of an attorney's bill; these factors

included the time and labor required, the difficulty of the task, the need to forego other work or clients, customary fees in the area for similar services, the amount of fees relative to the results obtained, the nature and length of the relationship, and the experience, reputation and ability of the lawyer.

{¶ 19} Tomb stated that the Epstein divorce required a moderate degree of skill, but did not involve very complex issues. Tomb described Epstein as "candid and honest" in their dealings, "with some notable exceptions." For example, Epstein's father and brother testified against Epstein in the divorce proceedings, alleging that Epstein had committed fraud in their business dealings. Epstein had not prepared Tomb for the possibility of this testimony or informed Tomb about the strained business relationship with his family members. Epstein also failed to inform Tomb about an insurance check Epstein had received for damage to the roof on the house that was in foreclosure. According to Tomb, these "surprises" complicated his handling of the case.

{¶ 20} With respect to the results Tomb obtained for Epstein, Tomb testified that Epstein's spousal support obligation, which had been $3,000 - $4,000 under the temporary orders, was eliminated, and his child support was significantly reduced, although the reductions were partially due to Epstein's loss of employment one month before the divorce hearing. Tomb also obtained more parenting time for Epstein.

{¶ 21} According to Tomb, Collins left the law firm two weeks before Epstein terminated Tomb's services. Collins's departure from the firm was not amicable.

{¶ 22} Epstein testified that he had verbally disputed his bills with Tomb on several occasions, and that he had complained about the bills to Collins many more times, but that he tried "not to sound like a broken record." He acknowledged, however, that

none of his complaints had been in writing or otherwise documented. In particular, Epstein stated that he had complained about the amount of time the paralegal billed for "menial" tasks, such as preparing letters and emails and making deliveries, which Epstein viewed as excessive. Epstein stated that he was initially "pacified" by Tomb's assurances that "we'll settle up at the end." Epstein testified that he or his girlfriend made monthly payments to the law firm during his representation, but that the amount of the payments went down when Epstein lost his job in 2011.

{¶ 23} Epstein terminated his relationship with the law firm in January 2012 "to make the billing stop" and because he felt he had been overcharged for the preparation of a quitclaim deed on one of the marital properties. Epstein also felt that he had been "taken advantage of" when he did not get a significant write-off on his final bill. He wanted an "accommodation" or a "meeting in the middle" on the bill dispute, because of his "mental anguish" and stress during the dispute over the bill.

{¶ 24} Epstein's girlfriend testified that she had sent one email to the law firm, which related to how previous payments had been applied. She also testified that she and Epstein had been assured by Tomb that the bill would "be taken care of" at the end of the case. She stated that she and Epstein "mistook [Tomb] as more of a friend than [he] was."

{¶ 25} Neither Epstein nor his girlfriend testified, specifically, as to what type of "accommodation" they expected to receive at the end of the case, but Epstein did assert that Collins had told him "upwards of forty percent."

{¶ 26} Epstein testified that he had filed a "grievance" with the Dayton Bar Association disputing Tomb's bill and that, after an "investigation," the DBA had

determined that the "bill was reasonable." Epstein acknowledged that he had not mentioned the expected "discount" or "write off" in the grievance. Although Epstein believed that the "grievance committee's decision" was "a joke," he did not "appeal."[1]

**{¶ 27}** Cheryl Collins testified for Epstein and stated that he had frequently complained to her, verbally, about his bill. She also testified that she was present for two or three conversations where Epstein complained to Tomb about the bill, and Tomb had assured Epstein that it would be settled at the end. According to Collins, "frequently Mr. Tomb would offer a fifty percent discount or some sort of discount for his clients if they would pay in full, rather than make payments on their bill." Collins acknowledged that some of her recollections at trial about conversations with Tomb and Epstein were inconsistent with her earlier deposition testimony.

**{¶ 28}** Finally, Brian Sommers, a "certified specialist in family relations law" in Dayton, testified for Epstein regarding the reasonableness of the law firm's fees. Sommers described the Epstein divorce as a "common type" divorce. Sommers testified that, in reviewing the law firm's charges, he looked through the entire file and compared the law firm's invoices with the related work product. He concluded that Epstein had been "overbilled" by $9,020, based on how long Sommers thought the designated tasks should have taken. In particular, he claimed that the paralegal billed "excessively" or unreasonably when she billed .5 hour for some short letters and emails, and billed her time spent delivering certain documents to opposing counsel in Dayton (from Troy), when the documents could or should have been "fed ex'd." Sommers did not dispute the

---

[1] Our characterization of the proceedings at the DBA is based on the testimony presented at trial. We express no opinion as to whether, or to what extent, these descriptions accurately describe the proceedings.

reasonableness of the hourly rates charged by Tomb and other employees of the firm.

**{¶ 29}** Sommers also testified that he had been "unable to determine what if any notes were ever taken to the file by Mr. Tomb," notwithstanding some references in the billings to "notes to file." In other words, Sommers stated that he could not "find the work product" for "notes to file" among the documents that were provided to him; thus, he concluded that .2 hour should be deducted for each such reference in the bills. He also concluded that the firm had overcharged for the preparation of a quitclaim deed, although he acknowledged that he did not know any details surrounding the preparation of the deed.

**{¶ 30}** Sommers calculated the amount that the law firm had "overbilled" Epstein by deducting various items that he could not substantiate by reviewing the work product (e.g., the "notes to file") and by reducing the amount billed where he thought that the time devoted to a task seemed unreasonable. On cross-examination, he acknowledged that there was some work, such as responses to texts and emails, that was not reflected in the law firms' bills; he had not accounted for any uncharged or undercharged work in his calculation of a reasonable fee. Sommers also testified that he had never had a client with whom he communicated by text or email up to 10 times per week.

**{¶ 31}** In rebuttal of Sommers's testimony, Tomb testified that he had not billed for "notes to file" specifically; rather, such a notation was made in conjunction with other billing, to remind himself of the taking of handwritten notes on a particular conversation or issue. He also testified about the quitclaim deed prepared in the case, the fee for which Sommers suggested had been unreasonable; Tomb stated that there had been a boundary dispute regarding the property in question and that the county recorder's office

had refused to accept the legal description of the property that had previously been used. Tomb agreed with Sommers that the preparation of a typical quitclaim deed would not be so costly, but described this particular deed as "an exceptional case."

### III.    Analysis of the Trial Court's Judgment

{¶ 32}  The trial court found in favor of the law firm on the claims for breach of contract and to collect on the account.   The trial court concluded that an attorney's belief that another attorney (or his paralegal) should be able to perform certain tasks in less time was not persuasive with respect to the reasonableness of the fees charges.   The court noted that Sommers did not offer any criticism of the quality of the work performed by Tomb or his paralegal.

{¶ 33}   However, the trial court found that Tomb's explanation of the "notes to file" references on the billing statements was "confusing," and that both experts who testified about the fees interpreted these notations as work charged to the client.   Because a plaintiff, in this case Tomb, has the burden of proving the reasonableness of the fees sought, the court found that it was appropriate to deduct .1 hour for each instance in which "note to file" appeared on the bill to Epstein, for a net deduction of $1,400.   With this exception, the court found that the fees charged by the law firm were reasonable.   The court deducted this amount from the last balance owed to Klein, Tomb and Eberly; after this deduction, Klein, Tomb, and Eberly was owed $4,780.86 (as of February 2, 2012), and Tomb Law was owed $7,439.07 (as of February 3, 2012), plus 18% interest.   The court denied the law firm's claim for unjust enrichment, as well as Epstein's claims for breach of contract, unjust enrichment, fraud, and abuse of process.

{¶ 34}  To prevail on a claim for breach of contract, the plaintiff must demonstrate

the existence of a binding contract or agreement, that the plaintiff (the non-breaching party) performed its contractual obligations, that the defendant failed to fulfill its contractual obligations without legal excuse, and that the plaintiff suffered damages as a result of the breach. *Otstot v. Owens*, 2d Dist. Clark No. 2015-CA-57, 2016-Ohio-233, ¶ 10, citing *Auto Sale, L.L.C. v. Am. Auto Credit, L.L.C.,* 8th Dist. Cuyahoga No. 102438, 2015-Ohio-4763, ¶ 15.

{¶ 35} Epstein's argument that the trial court erred in entering judgment in favor of the law firm on the firm's breach of contract claim essentially asserts that the trial court's judgment is against the manifest weight of the evidence. "[I]n order for an appellate court to reverse a decision as against the manifest weight of the evidence in a civil context, the court must determine whether the trier of fact, in resolving evidentiary conflicts and making credibility determinations, clearly lost its way and created a manifest miscarriage of justice." *Brewer v. Dick Lavy Farms, L.L.C.*, 2d Dist. Darke No. 2015-CA-7, 2016-Ohio-4577, ¶ 46, quoting *Alh Properties, P.L.L. v. Procare Automotive Service Solutions, LLC,* 9th Dist. Summit No. 20991, 2002-Ohio-4246, ¶ 12.

{¶ 36} The credibility of the witnesses and the weight to be given to their testimony are primarily matters for the trier of facts to resolve. *State v. DeHass,* 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness."

*State v. Lawson,* 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). *See also Bayes v. Dornon*, 2015-Ohio-3053, 37 N.E.3d 181, ¶ 53 (2d Dist.); *Individual Business Servs. v. Carmack,* 2d Dist. Montgomery No. 25286, 2013-Ohio-4819, ¶ 20.

**{¶ 37}** The trial court's conclusions that the law firm had not breached the contract with Epstein, that it was entitled to collect on its fees for representing Epstein in his divorce, and that, with the exception of the billings referencing "notes to file," those fees were reasonable, were supported by the law firm's evidence. In fact, even Epstein's expert conceded the reasonableness of the rates charged and did not contest the quality of the work. With the exception of the fees for "notes to file," the only real dispute was whether some of the work should have been done more quickly, and therefore Epstein should have been billed less.

**{¶ 38}** The trial court did not lose its way or create a manifest injustice when it concluded, after hearing all the evidence, that one attorney's testimony that the work of another attorney (or his staff) could have been completed more quickly was not a sufficient basis for finding a breach of contract, as long as the fees were reasonable for the work performed. This is especially true where the attorney making such an assertion acknowledged that he did not know the specific facts surrounding the work involved and the decisions made. The trial court did not err in concluding that the law firm had performed its contractual obligation with Epstein and that Epstein had failed to fulfill his contractual obligations, without legal excuse.

**{¶ 39}** The assignment of error is overruled.

## IV. Conclusion

**{¶ 40}** The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

HALL, J. and POWELL, J., concur.

(Hon. Stephen W. Powell, Twelfth District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio).

Copies mailed to:

Jeremy M. Tomb
P. J. Conboy II
Hon. Christopher Gee